# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-1833/1952

_____

United States of America,            *
                                     *
    Appellant/Cross-appellee,    *
                                     *   Appeal from the United States
v.                                   *   District Court for the
                                     *   Northern District of Iowa
Dustin Lee Honken,                   *
                                     *
    Appellee/Cross-appellant.    *

_____

Submitted:   October 21, 1998

Filed:   July 9, 1999

_____

Before McMILLIAN, JOHN R. GIBSON and HANSEN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.


The United States (the government) appeals from a 292-month sentence the United States District Court for the Northern District of Iowa imposed on appellee, Dustin Lee Honken, on his guilty plea to conspiring to distribute methamphetamine, in violation of 21 U.S.C. § 846, and to attempting to manufacture methamphetamine, in violation of 21 U.S.C. § 841(a)(1). In calculating appellee's sentence, the district court assessed a 2-level increase for obstruction of justice, and awarded appellee a 3-level acceptance of responsibility reduction. The government challenges the acceptance of

responsibility reduction contending that the district court adopted an incorrect legal standard for determining the existence of an "extraordinary case" in which a defendant who has obstructed justice may also receive a downward adjustment for acceptance of responsibility. See U.S.S.G. § 3E1.1, application note 4. Specifically, the government objects to the district court's conclusion that, if a defendant who has obstructed justice pleads guilty to the offense with which he is charged and does not commit any further obstruction of justice, then the case is "extraordinary," warranting the award of an acceptance of responsibility reduction. The government further contends that, in determining whether a case is extraordinary, the district court should take into account the totality of the circumstances, including the nature of the obstructive conduct and the degree of the defendant's acceptance of responsibility.

Appellee filed a cross-appeal, in which he argues that the district court erred not only in determining his drug quantity and in assessing the obstruction of justice enhancement, but also in attempting to manipulate his sentence by enlarging the scale of the crime, in violation of due process.

For the reasons stated herein, we reverse the sentence imposed by the district court and remand with directions to the district court to resentence appellee without a reduction in the offense level for his acceptance of responsibility. We also affirm the cross-appeal.

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. The prosecution of this appeal has been approved by the Solicitor General of the United States in accordance with 18 U.S.C. § 3742(b). This court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3742(b), which provides that the United States may file a notice of appeal for review of an otherwise final sentence if the sentence was imposed as a result of an incorrect application of the sentencing guidelines. Appellee cross-appealed.

BACKGROUND

In April 1993, a grand jury in the Northern District of Iowa indicted appellee for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment. In April 1996, a grand jury in the Northern District of Iowa again returned a 3-count indictment against appellee and one Timothy Cutkomp, charging them with drug related offenses.

Subsequently, in July 1996, the grand jury returned a superceding indictment that reinstated the April 1996 3-count indictment and added a fourth count against appellee. In July 1997 appellee pleaded guilty to counts One and Four of the superceding indictment. Count One charged that between 1992 and February 1996 appellee and Cutkomp conspired to manufacture, attempt to manufacture, and distribute methamphetamine. Count Four alleged that on or about February 7, 1996, appellee attempted to manufacture methamphetamine. The government agreed to and did dismiss Counts Two and Three, which alleged the unlawful possession of certain chemicals and equipment used in the production and manufacture of methamphetamine.[1]

After a sentencing hearing which spanned over five days in December 1997 and February 1998, the final pre-sentence report recommended that appellant's total offense level was 45, and that the guideline range was life imprisonment. The district court, however, concluded that the offense level was 38. The court assessed a base offense level of 36, a 3-level increase for the role in the offense and a 2-level increase for obstruction of justice. Contrary to the recommendation of the probation office, the

---

[1] In May 1996, Cutkomp had agreed to plead guilty to the conspiracy charged in Count One, and he cooperated with the government in the investigation and prosecution of appellee and others.

court also awarded appellant a 3-level decrease for acceptance of responsibility.[2] The court then sentenced appellee at the top of the resulting sentencing range of 235 to 293 months imprisonment.

The government's evidence at the sentencing hearing supported the recommendations of the probation office that appellant receive a 2-level adjustment for obstruction of justice, and that he receive no downward adjustment for acceptance of responsibility. The evidence supported several independent bases for an obstruction adjustment including that: (1) appellee caused the disappearance of one or more persons, including prospective prosecution witnesses, in 1993; (2) appellee attempted to kill witnesses while on pre-trial release in 1996; (3) after he was detained in June 1996, appellee attempted to kill another cooperating witness whose cooperation had resulted in his detention; (4) appellant attempted to escape from a county jail during the period of pre-trial detention; and (5) appellant procured another person to conceal evidence that was material to the case.[3]

The drug conspiracy to which appellee pleaded guilty began in 1992. At that time appellee and Cutkomp, who were childhood best friends in Iowa, had moved to Arizona. With financial assistance from appellee's brother, Jeff, the two began to manufacture methamphetamine near Tucson, Arizona. Customers for appellee's methamphetamine in 1992 and 1993 included two Iowans named Gregory Nicholson

---

[2]The district court declined to assess a 3-level adjustment recommended by the probation officer for committing the conspiracy offense while on pre-trial release between 1993 and 1995, and rejected the government's contention that appellant should have been assessed a 2-level increase for possession of a firearm.

[3]The government also moved for an upward departure from the guidelines based on the extreme nature of the defendant's obstruction of justice. The district court ruled that even if appellee killed witnesses, attempted to kill other witnesses before and after his pre-trial detention, attempted to escape from jail and procured another person to conceal evidence, the court would not make an upward departure.

and Terry DeGeus. Cutkomp testified that he and appellee delivered methamphetamine and collected money from Nicholson and DeGeus in Iowa. After Nicholson agreed to cooperate with the authorities, appellee was arrested on March 21, 1993. On that date, Nicholson conducted a tape recorded meeting with appellee during which Nicholson paid appellee $3,000 toward an outstanding debt for methamphetamine. After the meeting, law enforcement officers arrested appellee and Cutkomp as they left Nicholson's residence. This arrest led to the grand jury indictment in April 1993 for conspiracy to distribute methamphetamine. No federal charges were filed against Cutkomp at that time.

Nicholson was a cooperating witness for the prosecution in the 1993 case against appellee, and appellee had agreed to plead guilty at a hearing set for July 30, 1993. At that time, Nicholson lived in Mason City, Iowa, with his girlfriend, Laurie Duncan, and Duncan's two young daughters. Approximately five days before appellee's scheduled guilty plea hearing, on or about July 25, 1993, Nicholson and the Duncans disappeared. At a neighbor's residence, investigators discovered a note stating, "Phyllis, had to leave on short notice. Will be in touch shortly, Love, Laurie."

The Duncan house showed no sign of packing. No vehicles were missing from the residence. Investigation of local motels, airlines, busses, taxis and rental car agencies found no evidence of travel by Nicholson or the Duncans. Mrs. Duncan's bank account had a balance of over $600. Since July 1993 the account has had no transactions, other than a deposit by the State of Iowa. On June 19, 1995, three boys swimming in a river near Fertile, Iowa, found a black purse containing Laurie Duncan's drivers license, two library cards and two rings, one of which bore Duncan's maiden name. Recent checks in all 50 states by law enforcement agents have located no person using the name, date or birth, or social security number of Nicholson or Laurie Duncan. Schools attended by Duncan's daughters have never been contacted to obtain student records for the girls. In short, law enforcement officers have been unable to find any evidence that Nicholson or the Duncans are still alive. Rather strangely, on

July 30, 1993, the date of appellee's scheduled guilty plea hearing, appellee advised the court that he had changed his mind and wished to proceed to trial because appellee and his attorney did not think that the case against him was as strong as the government believed.

Cutkomp testified that appellee told him in 1993 about the disappearance of Nicholson and the Duncans. He said that appellee presented him with a hypothetical scenario in which Cutkomp and close friends or family were held as hostages while Cutkomp was ordered to make a videotape exonerating another person accused of a crime. Appellee thereafter asked Cutkomp whether he would agree to make the videotape under those circumstances. When Cutkomp replied that he would not, appellee told him that all of the hostages would be killed whether or not the person agreed to make the videotape. Cutkomp further testified that at a later date--during the winter of 1993-94--appellant showed him a videotape and said that Greg Nicholson had made the tape. According to Cutkomp, appellee told him that the tape showed Nicholson stating that appellee was not involved in the drug business, and that Nicholson was sorry for turning in appellee to law enforcement. Cutkomp testified that appellee asked him to say that Nicholson had come to him with the videotape, so Cutkomp might provide sufficient foundation to admit the videotape in court. Cutkomp said he never viewed the tape.

Cutkomp testified that after Nicholson's disappearance appellee told him that Terry DeGeus (a second methamphetamine customer of appellee) had been subpoenaed to the grand jury. Cutkomp said that appellee was concerned that if DeGeus was charged, he would probably roll over and turn appellee in. On or about November 5, 1993, DeGeus disappeared. DeGeus' father said he last saw Terry on that date. Terry DeGeus told his father that he was going to meet Angie Johnson, a woman who was appellee's girlfriend at the time and a former girlfriend of DeGeus. Angie Johnson told law enforcement officers that she saw DeGeus for the last time on November 5, 1993,

outside the Mason City Country Club where she worked. DeGeus' vehicle was later found abandoned at an apartment complex in Mason City, Iowa.

Cutkomp testified that in a discussion with appellee about DeGeus' disappearance in the spring of 1994, appellee talked about DeGeus' disappearance and asked Cutkomp how deep farm equipment reached when farmers plowed land. Cutkomp said that he interpreted this to mean appellee was worried that DeGeus' body was not buried deep enough. Cutkomp said that on another occasion, appellee asked how far down he needed to bury something to be sure that the frost would not bring it up out of the ground. Appellee also told Cutkomp that he wanted to purchase a backhoe to get rid of loose ends and appellee wondered aloud, according to Cutkomp, how to build an incinerator and how hot an incinerator must be to burn a body.

Cutkomp further testified that in 1994 he asked appellee about the likelihood that either Greg Nicholson or Terry DeGeus would show up again, and appellee told him that he was "99 percent sure that Greg would never show up again, but he was less percent sure of Terry." Cutkomp interpreted this to mean that the bodies of Nicholson and the Duncans were buried deeply enough that they would not be found, but that appellee was worried that he had not buried DeGeus' body with sufficient depth. Cutkomp testified that after DeGeus disappeared appellee contacted him for assistance in disposing of a firearm. Cutkomp said that appellee told him that Angie Johnson had purchased the handgun in or around Waterloo, Iowa. A firearm transaction record showed that Johnson purchased a Tec-9 pistol at a pawn shop in Waterloo on July 7, 1993. According to Cutkomp appellee said he had purchased a gun to protect himself from DeGeus, that he didn't need the gun anymore because Terry had disappeared and that "if they were to find the gun, it would look bad to have a gun." Cutkomp said that he and appellee melted down the gun with a torch and threw it in a ditch along a road. He further said they had also disposed of a piece of metal on which the gun had been melted because they didn't want any evidence of the gun there.

The 1993 federal drug case against appellee was dismissed in March 1995, due largely to the disappearance of Nicholson. At that time, appellee was employed by Kraft Foods in Mason City, Iowa. Another Kraft employee, Daniel Cobeen, testified that he met appellee at work in the beginning or middle of 1995, and that appellee approached him about becoming involved in the distribution and the manufacture of methamphetamine. Cobeen reported this information to law enforcement agents, and agreed to cooperate with agents by working in an undercover capacity. Cobeen testified that appellee said that Cutkomp and Angie Johnson had invested money in his methamphetamine laboratory, and that while cooperating with the agents, he accompanied Cutkomp and appellee to acquire equipment for the laboratory.

With the information from Cobeen, agents obtained a warrant to search appellee's house in Mason City, IA. There the agents found and seized evidence of a methamphetamine laboratory. This evidence led to the indictment of appellee and Cutkomp in April 1996. However, at the time of the execution of the search warrant, appellee had already concealed a hydrogen tank, which was used in the last phase of manufacturing methamphetamine. Appellee had requested a co-worker, Jay Lien, to keep the hydrogen tank for him. After the search of appellee's home, appellee advised Lien to move the tank to a different location, which Lien did. Nevertheless, police eventually found and seized the tank.

Cutkomp testified that after their indictment, appellee and he discussed schemes to destroy the evidence authorities had against them. Cutkomp testified that he and appellee identified and conducted surveillance on a storage facility in Bondurant, IA, where appellee believed the seized evidence was stored. He testified that he and appellee planned to break into the facility and destroy the chemicals and other evidence seized. Cutkomp testified that appellee also suggested that killing or making unavailable certain witnesses would help them escape prosecution. Specifically, appellee mentioned that the absence of key prosecution witnesses, such as cooperating witness Cobeen, Special Agent John Graham of the Iowa Division of Narcotics

Enforcement, Special Agent David Mizell of the Drug Enforcement Administration, and laboratory chemists, would hinder prosecution of their case. Electronic monitoring of conversations between Cutkomp and appellee, transcribed and entered into evidence at the sentencing hearing, revealed that appellee made statements that indicated he wanted to kill or otherwise prevent these witnesses from testifying against him and Cutkomp.

Appellee also talked about eluding the electronic monitoring devise he wore as a condition of his pretrial release. He mentioned that his best alibi, should anything happen to a witness, would be if he could make the monitor show he was home when he was actually elsewhere. In addition, three of appellee's co-workers at Kraft Foods testified that appellee approached them asking them to purchase a hand gun for him. One co-worker purchased a gun for appellee, but appellee was rearrested before the transfer could take place.

After being rearrested, appellee was held in the Woodbury County Jail pending trial. A fellow prisoner, Dean Donaldson, testified that at the jail appellee solicited him to kill Cutkomp and intimidate Cobeen. Donaldson testified that appellee arranged for his girlfriend, Kathy Rick, to post Donaldson's bail, which, according to the bonding company's records, she did. Donaldson further testified that appellee gave him detailed information about Cutkomp, including directions to and diagrams of Cutkomp's residence, Cutkomp's work schedule and dates when Cutkomp was likely to wake up early when it was still dark, even indicated places where Donaldson could hide at Cutkomp's residence, and offered Donaldson a large sum of money to kill Cutkomp. Appellee had Donaldson recopy this information so it would not appear in appellee's handwriting. In addition, appellee gave Donaldson the address of Cobeen's father and instructions about an intimidating note Donaldson should send there after he killed Cutkomp. Donaldson did not carry out appellee's instructions, and after he informed police about the plot, the police seized the documents he and appellee had drafted. Donaldson was later rearrested and returned to the Woodbury Jail. He testified that

when appellee saw him, appellee pointed his hand at Donaldson in the form of a gun and called him a "snitch."

Several witnesses testified that appellee attempted to break out of the Woodbury Jail during his pretrial detention. Another fellow prisoner, Dennis Putzier, testified that appellee asked him to break out of the jail and "get rid of" Cutkomp in return for appellee "taking care of Putzier forever." Putzier attempted to break through the wall to escape, but his efforts were thwarted by a reinforcement bar. Putzier testified that appellee gave him an abrasive object appellee broke from the staircase to cut through the bar and that appellee told him appellee's girlfriend would bring a hacksaw, rope, and other tools to aid in the escape. In addition, several inmates testified that appellee stated he was going to attempt to break through the wall of his cell so that appellee could escape with Putzier. The Jailers found damage to the wall in appellee's cell.

Dana Rasmussen, appellee's cell mate beginning in December 1996, testified that appellee attempted to solicit him to kill appellee's childhood friend. When Rasmussen refused, appellee concocted a plan to do a "drive-by" and shoot up the windows on the friend's house to scare him. Appellee drew Rasmussen a map, which he made Rasmussen recopy because appellee did not want it to appear in his handwriting.

At the sentencing hearing, appellee accepted responsibility for the attempt to manufacture methamphetamine, but denied his involvement with any obstruction of justice, including the disappearances of Nicholson, the Duncans and DeGeus, destroying the Tec-9 firearm with Cutkomp, masterminding the plot to kill or intimidate Cobeen, posting bond for Donaldson in return for Donaldson killing Cutkomp, attempts to break out of the Woodbury Jail, and hiding the hydrogen tank to prevent its discovery by law enforcement.

## DISCUSSION

I.

The government contends that the district court adopted an incorrect legal standard for determining the presence of an "extraordinary case" in which a criminal defendant who has obstructed justice may also receive a downward adjustment for acceptance of responsibility. We review the district court's interpretation de novo. See United States v. Wells, 127 F.3d 739, 744 (8th Cir. 1997); United States v. Drapeau, 121 F.3d 344, 347 (8th Cir. 1997).

U.S.S.G. § 3E1.1(a) states that "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."[4] Application Note 4 to § 3E1.1 provides:

> Conduct resulting in an enhancement under § 3C1.1 (obstructing or impeding the administration of justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may be, however, extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply.

---

[4] § 3E1.1(b)(2) provides that if the defendant qualified for a decrease under subsection (a) then the court should decrease the offense level by an additional level if the defendant timely notified authorities of his intention to enter a plea of guilty. The application of that section is not at issue in this appeal.

U.S.S.G. § 3E1.1, application note 4.[5]  The burden is on the defendant to establish that he is entitled to a downward adjustment for the acceptance of responsibility.  See United States v. Janis, 71 F.3d 308, 310 (8th Cir. 1995) (quoting United States v. Drapeau, 943 F.2d 27, 29 (8th Cir. 1991)).

The district court appears to have adopted a bright line definition of an "extraordinary case" in which a defendant who obstructs justice may also receive a downward adjustment for acceptance of responsibility.  Drawing upon language from a decision of the Ninth Circuit in United States v. Hopper, 27 F.3d 378 (9th Cir. 1994), the district court concluded that if a defendant who has obstructed justice pleads guilty to the underlying offense with which he is charged (in this case, drug trafficking offenses) and commits no further obstruction of justice between the guilty plea and the sentencing hearing, then the district court must consider the case an "extraordinary" one in which the defendant should receive a downward adjustment for acceptance of responsibility. (Tr. 1291, 1256-57).  Therefore, the district court having found no obstruction by appellee after the date of his guilty plea concluded that the case was "extraordinary" and awarded appellee a downward adjustment for acceptance of responsibility based upon its reading of Hopper[6] .

_____

[5]Commentary in the guidelines manual that interprets or explains a guideline is authoratative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.  Stinson v. United States, 508 U.S. 36, 38 (1993).  There has been no suggestion that application note 4 is an erroneous construction of the acceptance of responsibility guidelines or that it is otherwise inconsistent with law.  Accordingly, application note 4 is binding on the district courts and must be enforced according to its terms.  See, e.g., United States v. Mendoza-Figueroa, 65 F.3d 691, 693 (8th Cir. 1995) (en banc).

[6]The district court also cited United States v. Talladino, 38 F.3d 1255 (1st Cir. 1994), in support of its interpretation of the guideline commentary.  The Talladino case, however addresses only whether the defendant qualified for an additional 1-level reduction for acceptance of responsibility pursuant to a U.S.S.G. § 3E1.1(b), after

We hold that the district court's legal standard is inconsistent with the plain language of the guideline commentary and the prior decisions of this court and other courts of appeals. To determine whether a case is "extraordinary," the district court should have taken into account the totality of the circumstances, including the nature of the appellee's obstructive conduct and the degree of appellee's acceptance of responsibility. Among other things, the district court should have considered whether, for example, the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution. It should have considered whether appellee voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement. See United States v. Johnston, 973 F.2d 611, 614 (8th Cir. 1992); see also U.S.S.G. § 3E1.1, application note 1(d). The district court should have noted whether appellee admitted and recanted his obstructive conduct, or whether he denied obstruction of justice at sentencing. See U.S.S.G. § 3E1.1, application note 1(a). Moreover, in our opinion the district court should have also weighed not only whether the defendant pleaded guilty to the underlying offense but also whether he assisted in the investigation of his offense and the offenses of others. See United States v. Dortch, 923 F.2d 629, 633 n.3 (8th Cir. 1991). We observe and note that there is no magic formula for defining an "extraordinary case," but we hold it was error for the district court to hold as a matter of law that mere cessation of obstructive conduct coupled with a guilty plea to the underlying offense necessarily makes a case extraordinary for purposes of § 3E1.1, application note 4.

Because the sentencing guidelines do not define the phrase "extraordinary case," in our opinion, the term should thus be given the ordinary meaning.[7] See Chapman v.

receiving a 2-level decrease pursuant to § 3E1.1(a). See id. at 1263-66. The First Circuit did not consider whether the district court properly found an "extraordinary case" in which adjustments under both §§ 3C1.1 and 3E1.1(a) may apply.

[7]The current version of § 3E1.1, application note 4 became effective on November 1, 1989. Prior to November 1, 1989, the commentary provided that a

United States, 500 U.S. 453, 454 (1991); United States v. Regans, 125 F.3d 685, 686 (8th Cir. 1997), cert. denied, 118 S. Ct. 1398 (1998); United States v. Waggoner, 103 F.3d 724, 726 (8th Cir. 1997). Webster's Dictionary defines "extraordinary" as "more than ordinary," "going beyond what is usual, regular, common, or customary," or "exceptional to a very marked extent." Webster's Third New International Dictionary, 807 (1993) (hereinafter "Webster's Dictionary"). Black's Law Dictionary similarly defines "extraordinary" as "out of the ordinary," "exceeding the usual, average or normal measure or degree," "remarkable," "uncommon," or "rare." Black's Law Dictionary, 527 (5th ed. 1979).

This meaning of "extraordinary" is consistent with the use of the phrase "extraordinary case" in other sections of the sentencing guidelines. It should generally be presumed that the same word used in different parts of the guidelines has the same meaning. See United States v. Terry, 142 F.3d 702, 711-12 (4th Cir. 1998) (reviewing other sections of guidelines to determine how the undefined term "victim" should be interpreted); cf. Rutledge v. United States, 517 U.S. 292, 299-300 & n.10 (1996) (where Congress used same phrase in other statutes, the same meaning is presumed in statute under examination) (quoting Jeffers v. United States, 432 U.S. 137, 149 n.14 (1997) (plurality opinion)); Smith v. Sullivan, 982 F.2d 308, 314 (8th Cir. 1992) ("[g]enerally, when the same words are used in different section of the law, they will be given the same meaning") (quoting Barnson v. United States, 816 F.2d 549, 554

---

downward adjustment for acceptance of responsibility was "not warranted" where the defendant "obstructs the trial or the administration of justice." U.S.S.G. § 3E1.1, application note 4 (November 1987); see United States v. Holland, 884 F.2d 354, 358 (8th Cir. 1989); United States v. Reynolds, 900 F.2d 1000, 1005 (7th Cir. 1990). The commentary was amended in 1989 to provide for extraordinary cases in which adjustment under both § 3C1.1 and § 3E1.1 are appropriate. See U.S.S.G. App. C (Nov. 1997) (amendment 258). One court inferred that the change was adopted to provide an incentive for defendants to recant and to make amends for obstructing justice. See United States v. Dillon, 905 F.2d 1034, 1039 n.1 (7th Cir. 1990).

(19th Cir. 1987)). The phrase "extraordinary case" appears in two other places in the guideline manual: § 5K2.0 and § 2D1.1. The commentary to § 5K2.0 explains that the commission "does not foreclose the possibility of an extraordinary case" in which departure from the guidelines may be warranted based on a combination of factors, "even though none of the characteristics or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0, commentary. The commentary does not further define "extraordinary case," but the Commission specified that such a case would be "extremely rare." Id. (emphasis added). § 2D1.1, application note 17 provides that in an "extraordinary case" an upward departure may be warranted above offense level 38 based on the quantity of drugs involved in a drug trafficking case. The Sentencing Commission's explanation sheds light on its intended meaning of "extraordinary case," as such a departure is suggested only where "the quantity is at least 10 times the minimum quantity required for level 38." U.S.S.G. § 2D1.1, application note 17. These examples confirm that when the Commission refers to an "extraordinary case," it means a situation that is extremely rare and highly exceptional. Thus the terms of § 3E1.1, application note 4 require an obstructive defendant to do more than merely cease obstructive conduct and plead guilty to the underlying offense to earn a downward adjustment for acceptance of responsibility.

However, in our opinion, the district court's definition of an "extraordinary case" is so broad that it swallows the "ordinary" case. Virtually every defendant who receives an acceptance of responsibility adjustment enters a plea of guilty. The guideline commentary explains that the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and only then admits guilt and expresses remorse. " U.S.S.G. § 3E1.1, application note 2. And virtually every defendant who receives an acceptance of responsibility adjustment commits no obstruction of justice between the guilty plea and the sentencing hearing, for post-plea obstructive conduct would almost certainly be disqualifying. See e.g., United States v. Nguyen, 52 F.3d 192 (8th Cir. 1995) (defendant committed an offense while released

-15-

on bond after guilty plea); <u>United States v. Loeb</u>, 45 F.3d 719, 722 (2nd Cir. 1995) (defendant failed to appear for sentencing); <u>United States v. Merino</u>, 44 F.3d 749, 755 (9th Cir. 1994) (defendant lied to probation officer to obstruct sentencing). Contrary to the plain meaning of "extraordinary" the district court standard does not require the obstructive defendant to do anything that is "more than ordinary," or to go "beyond what is usual, regular, common, or customary" to earn an acceptance of responsibility downward departure. <u>Webster's Dictionary</u> at 807.

Furthermore, this court has previously indicated that a defendant must show more than a guilty plea and a cessation of obstructive conduct to establish an "extraordinary case" for purposes of § 3E1.1, application note 4. In <u>United States v. Dortch</u>, 923 F.2d 629 (8th Cir. 1991), the defendant received an enhancement for obstruction of justice because he tossed a bag of cocaine out of the window of his vehicle during a traffic stop. <u>Id.</u> at 631-32. He argued that he should have received an acceptance of responsibility reduction as well because "he voluntarily surrendered to authorities, acquiesced in the forfeiture of his vehicle, cooperated with the probation officer, withdrew his motion to suppress evidence and statements, and entered a plea of guilty." <u>Id.</u> at 633. This court concluded that <u>Dortch</u> was not the kind of extraordinary case in which both an increase for obstruction of justice and a reduction for acceptance of responsibility would be warranted. <u>Id.</u> at 633 n.3. The court said although the defendant "did plead guilty and cooperated with the authorities with respect to his case . . . he also made false exculpatory statements at the time of [his] arrest, justified his involvement with cocaine as a means of supporting his family, and did not supply any information about others." <u>Id.</u>

In <u>United States v. Johnston</u>, 973 F.2d 611 (8th Cir. 1992), this court again upheld the district court's denial of an acceptance of responsibility reduction, even though the defendant pled guilty and committed no obstruction of justice after the plea. The court found that the defendant obstructed justice by destroying marijuana plants, fleeing from Iowa, and attempting to procure a false alibi. <u>See id.</u> at 614. Although the

defendant later pled guilty, this court affirmed the denial of an acceptance adjustment based on the district court's finding that the acceptance of responsibility was "an eleventh-hour jailhouse conversion and that [the defendant] did not voluntarily terminate his criminal activity." Id.

The district court's reliance upon the Hopper case is misplaced and its broad reading has been rejected by other courts of appeals. In United States v. Hawley, 93 F.3d 682 (10th Cir. 1996), the Tenth Circuit held that a defendant who received an obstruction adjustment for flight while on pretrial release was not entitled to an adjustment for acceptance of responsibility. The court reached this conclusion even though the defendant, upon his arrest for fleeing the jurisdiction, "immediately entered into negotiations with the government to provide information concerning other criminal activity and entered his plea of guilty." Id. at 689. The Tenth Circuit declined to accept the defendant's argument, based upon Hopper, that "the conduct forming the basis for the obstruction of justice enhancement ceased and was replaced by conduct indicating a clear acceptance of responsibility." Id. The court emphasized that the defendant's good conduct after his rearrest was not voluntary; law enforcement was required to arrest the defendant and to return him to the jurisdiction. Notwithstanding the defendant's subsequent guilty plea and cessation of obstructive conduct, the court held that the defendant's violation of an appearance bond provided adequate foundation for the district court's decision to deny an acceptance reduction. See id.

Although neither the Second nor the Fifth Circuit cited to the Hopper case, both appear to have rejected the broad principle arguably suggested by that Ninth Circuit case. See United States v. Giwah, 84 F.3d 109, 113 (2d Cir. 1996) (specifically rejecting the argument that the defendant's perjury should not preclude acceptance of responsibility because it occurred long before the plea agreement.); United States v. Ayala, 47 F.3d 688, 690-91 (5th Cir. 1995) (rejecting defendant's argument that he should have received an acceptance of responsibility adjustment because he pleaded

guilty promptly after being arrested on a fugitive warrant and because the government agreed to recommend the adjustment as not an "extraordinary case" under § 3E1.1.)

In addition our reading of the Hopper case shows that while the decision contains the broad language seized upon by the district court, the circumstances of that case do not support the rule it adopted. In Hopper, the Ninth Circuit opined that the relevant inquiry for determining if a case is an extraordinary one according to application note 4 is "whether the defendant's obstructive conduct is not inconsistent with his acceptance of responsibility." Hopper, 27 F.3d at 383. The Ninth Circuit said those cases in which "obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." Id. In other words, the Ninth Circuit held that an extraordinary case within the meaning of application note 4 is one where a defendant's acceptance of responsibility is not contradicted by an ongoing attempt to obstruct justice, therefore permitting simultaneous adjustments under §§ 3C1.1 and 3E1.1.

In our opinion, the facts in Hopper support a much narrower conclusion. The defendant in that case received an adjustment for obstruction of justice because he burned evidence and attempted to buy false alibis after hearing that an accomplice in a robbery (his father) was arrested. See id. at 381. After the obstructive conduct, the defendant did more than merely plead guilty and cease obstruction of justice, he signed a plea agreement in which he expressly admitted the obstructive conduct, confessed guilt, and disclosed information about the crime. See id. The defendant's obstructive conduct occurred soon after he discovered his father had been arrested, and although the conduct persisted for a few days, it was not a methodical, continued effort to obstruct justice. Hence, Hopper does not necessarily dictate that a defendant who engaged in a methodical, continued effort to obstruct justice or who refused to admit his obstructive conduct would receive an adjustment for acceptance of responsibility even in the Ninth Circuit.

The standard applied by the district court here is simply inconsistent with the plain meaning of the guideline commentary and the prior decisions of this court discussed above. See, e.g., Johnston, 973 F.2d at 614; Dortch, 923 F.2d at 632-32. Not every defendant can present an extraordinary case deserving of acceptance of responsibility merely by pleading guilty and ceasing to obstruct justice. In our opinion, and we so hold, the district court must inquire into the particular circumstances of the defendant's case: was the defendant's obstructive conduct a relatively brief or early aberration, or was it a methodical, continued effort to obstruct justice? We hold that the mere fact of the guilty plea to the underlying offense, followed by an absence of post-plea obstructive conduct is not by itself sufficient to establish an extraordinary case as a matter of law; therefore, we also hold that the district court erred in granting appellee an adjustment for acceptance of responsibility. Note what the district court itself said:

> I'll help you out on your appeal. If that is the law, that you balance the degree of obstruction in determining whether or not post-plea cessation of obstruction of justice qualify for acceptance of responsibility. I would not give acceptance of responsibility in this case. But I don't read Hopper as saying that, and I don't think there's enough guidance – I am not being critical of the circuit. I just don't think that they have had an opportunity to expose their views on it. And if you do weigh the obstruction on the one hand and acceptance on the other, this case would not qualify for acceptance of responsibility in my view. So if I give it, that will make your job easier on appeal, if that's the law.

(Tr. 1256).

This record clearly supports the district court's conclusion that appellee's bid for acceptance of responsibility adjustment fails when considered in light of all of the circumstances. Appellee pursued obstruction of justice in a purposeful and methodical way that even the Ninth Circuit has said is inconsistent with the acceptance of responsibility. See Hopper, 27 F.3d at 383 (citing United States v. Lato, 934 F.2d

-19-

1080, 1083 (9th Cir. 1981)). Although it is true that the district court did not make any alternative findings on obstruction of justice, its comments concerning acceptance of responsibility and its statement that testimony about obstruction would be another basis to sentence appellee at the top of the guideline range, indicate to us that the court recognized this was not a typical obstruction case.

As in Hawley, 93 F.3d at 689, and Johnston, 973 F.2d at 614, appellee's cessation of obstruction can hardly be considered voluntary. See U.S.S.G. § 3E1.1, comment note 1(b). Here, appellee was arrested and detained after the government and the court learned of his efforts to avoid electronic monitoring and to kill witness Cobeen while on pre-trial release. Then while detained, appellee attempted to kill witness Cutkomp, intimidate witness Cobeen, and escape from the jail. Only after his extended efforts at obstruction had failed, and the trial date approached, did appellee agree to plead guilty.

We note that any acceptance of responsibility demonstrated by appellee was minimal. Unlike the defendant in Hopper, appellee refused to admit his obstructive conduct. See Hopper, 27 F.3d at 383. Likewise, Appellee disclosed little information about his criminal activities. At the sentencing hearing, appellee specifically denied each basis for an obstruction of justice adjustment that was advanced by the government (Tr. 1068), including the concealment of the hydrogen tank that the district court specifically found to be true. See U.S.S.G. § 3E1.1, application note 1(a) ("defendant who falsely denies . . . relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility").

We believe that this case is extraordinary only by virtue of the extensive evidence gathered and presented concerning the defendant's continuing efforts to obstruct justice. Furthermore, it is not one of the rare extraordinary cases in which a defendant who has obstructed justice nonetheless earns, by his other positive actions, an adjustment for acceptance of responsibility. We note that a reasonable finder of fact could easily conclude from witnesses' testimony that appellee caused the disappearance

of one or more persons, including prospective prosecution witnesses, in 1993; attempted to kill witnesses while on pre-trial release in 1996; attempted to kill another cooperating witness whose cooperation had resulted in his detention in June 1996; attempted to escape from a county jail during the period of pre-trial detention; and finally, procured another person to conceal material evidence. This is conduct that strikes at the very heart of the administration of justice.

## II.

Finally, appellee Honken in his cross appeal has raised three issues: First, that the court erred in granting a 2-level upward adjustment for obstruction of justice in relation to the alleged attempt to conceal the hydrogen tank; second, that the district court erred in finding that a five-gallon can seized from appellee's residence was full of toluene when the government neither measured nor tested the can's contents; and finally, that the district court violated his due process rights by approving the government's alleged attempt to manipulate appellee's sentence by enlarging the scale of his crime.

After a careful review of the record and the parties' briefs, we conclude that the district court in its rulings neither abused its discretion nor was clearly erroneous. Consequently, we affirm the cross appeal.

Accordingly, we reverse and remand the district court's judgment with directions to the district court to resentence appellee without a reduction in the offense level for acceptance of responsibility, and affirm the cross appeal.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.