# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-2986
_____

United States of America

*Plaintiff - Appellee*

v.

Adetokunbo Olubunmi Adejumo, also known as Malik, also known as D, also known as Tods, also known as Tokunbo, also known as T

*Defendant - Appellant*

_____

No. 12-3009
_____

United States of America

*Plaintiff - Appellee*

v.

Julian Okeayainneh, also known as Julius Inneh, also known as Julian Nosa Inneh, also known as J.J., also known as Julian Okeaya-Inneh

*Defendant - Appellant*

_____

No. 12-3010
_____

United States of America

*Plaintiff - Appellee*

v.

Olugbenga Temidago Adeniran, also known as Dennis Lok, also known as Dayo Olugbega, also known as Andre T. Andeiran, also known as Andeniran T. Dayo, also known as Oluwafemi Olarewaju Osibodu, also known as Dayo, also known as Dre, also known as Olugbenga Temidayo Adeniran

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota - St. Paul
_____

Submitted: November 19, 2013
Filed: November 25, 2014
_____

Before RILEY, Chief Judge, MELLOY and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

On March 8, 2011, Adetokunbo Adejumo, Julian Okeayainneh, Olugbenga Adeniran and nine others were charged in a 57-count indictment with conspiracy to commit bank fraud, as well as substantive counts of bank fraud, mail- and wire fraud, identity theft, money laundering, and trafficking in false authentication features.

-2-

Okeayainneh and Adeniran, along with two others, proceeded to trial.[1] After an 11-day trial, Okeayainneh was convicted of conspiracy to commit bank fraud and 25 substantive fraud-related counts. He was acquitted on one count of aiding and abetting aggravated identity theft. Adeniran was convicted of conspiracy to commit bank fraud and 8 substantive fraud-related counts. Adejumo pleaded guilty to one count of bank fraud and one count of aggravated identity theft. Okeayainneh and Adeniran appeal their convictions and sentences. Adejumo appeals his sentence. After careful review of the record and of all issues raised on appeal, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

"We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts." United States v. Ramon-Rodriguez, 492 F.3d 930, 934 (8th Cir. 2007). In 2009, various federal and state agencies that had been independently investigating fraud in the Minneapolis metro area joined forces in a massive criminal investigation nicknamed Operation Starburst. The investigation led to the indictment of more than forty people on charges of bank fraud and aggravated identity theft, most of whom resided in Minnesota. Participants in the scheme used stolen identity information to create counterfeit identifications for use in committing bank fraud. The bank fraud took two main forms. In one form, counterfeit identification documents were used to open accounts at various federally insured banks, which were then used as conduits for cashing stolen or counterfeit checks. The bulk of these proceeds went to Okeayainneh and co-conspirator Olidipo Coker.[2] In its other form, the bank fraud

---

[1]By the time of trial, a 41-count third superseding indictment had been returned. At trial, Nana Osei-Tutu and Fata Leeta Sarnor David were acquitted of all charges.

[2]Coker was indicted but was a fugitive at the time of trial.

involved stolen credit cards that were used to purchase gift cards or obtain cash advances.

On January 7, 2010, Adeniran came to the attention of Officer Joel Moore, an Edina, Minnesota, police officer who was patrolling the parking lot of Southdale Center in Edina. Officer Moore testified at trial he observed an idling parked vehicle with two men inside. One of the men was Coker. A third man entered and then quickly exited the vehicle; he was subsequently identified as Adeniran. After contacting mall security, Officer Moore determined that Adeniran had purchased three $500 gift cards from the Southdale Center customer-service kiosk using a stolen credit card. Adeniran was arrested. The vehicle and the other men were searched, but Coker and the other man were allowed to leave. The stolen credit card Adeniran had used was not recovered from him.

At the time of his arrest, Adeniran had identification information for at least three additional people on his person, including dates of birth, social security numbers, addresses, and credit-card numbers. While in custody, Adeniran swallowed a second piece of paper containing victim information. From jail, Adeniran called Coker, Adejumo, and others. The phone calls were recorded. In them, he talked about the fraud he had committed and his destruction of evidence; he also attempted to find someone to tender bail.

After Adeniran's arrest, investigators determined he had committed similar frauds around the same time. They learned that in November and December 2009, Adeniran had taken out cash advances at U.S. Bank and TCF Bank and purchased gift cards at a customer-service booth at the Mall of America, each time using a stolen credit card. On May 20, 2010, Adeniran pleaded guilty in Minnesota state court to identity theft for using the fake credit card at Southdale Center.

On November 3, 2010, Angela Grigsby was arrested in Eau Claire, Wisconsin, when she tried to withdraw money from a fraudulent bank account she had opened at Coker's direction. Grigsby provided investigators information that allowed law enforcement to obtain a search warrant for a storage locker in California Okeayainneh had rented under a false name since 2006.

On December 17, 2010, law enforcement executed the search warrant for Okeayainneh's storage locker. The locker contained stolen and counterfeit checks with a face value of over $18 million. It also contained blank check stock, photographs of co-conspirators—including Adeniran—and documents related to credit-card fraud against Chase Bank. The locker also held 500 credit cards in the names of various people and equipment for manufacturing fraudulent credit cards. In total, agents found forms of identification for 8700 different people in the storage locker. Okeayainneh arrived during the execution of the search warrant. Although he initially told law enforcement the locker was not his, he had the key to the locker in his car. Okeayainneh was arrested. Subsequently subpoenaed records and security video tapes showed that Okeayainneh accessed the storage locker on a daily basis, often several times a day.

Following his arrest, Okeayainneh gave a proffer statement to law enforcement during which he made several admissions. Despite giving the proffer, Okeayainneh ultimately decided to go to trial. Because the district court agreed with the government that Okeayainneh had provided false information during his proffer, his statements were admitted as evidence at trial against him.

Law enforcement officers from various state and federal agencies and internal fraud investigators from the defrauded financial institutions testified at trial. Co-conspirators who had pleaded guilty testified about their respective roles in the conspiracy as well as the roles of Okeayainneh, Coker, Adeniran, and Adejumo.

Okeayainneh and Adeniran appeal the district court's denial of their motions to dismiss the third superseding indictment on Speedy Trial Act grounds and their motions for judgment of acquittal on Count 1 of the third superseding indictment—the bank-fraud conspiracy count. Okeayainneh appeals the district court's decision to admit into evidence the government's "conspiracy chart" and its decision to allow the government to introduce statements he made during his proffer. All three defendants raise issues related to sentencing. We address each defendant's arguments in turn.

## II. Discussion

### A. Speedy Trial Act

On September 29, 2011, Okeayainneh and Adeniran appeared before the court to discuss the status of the case and to schedule a trial date.[3] The court proposed a February 7, 2012, trial date. Both Okeayainneh and Adeniran waived their speedy-trial rights on the record. The district court set the trial for February 7, 2012, but failed to give its reasons either orally or in writing why the ends of justice would be served by the continuance.

In January 2012, Okeayainneh and Adeniran each filed a motion to dismiss the third superseding indictment pursuant to 18 U.S.C. § 3162(a)(2), arguing the district court did not state adequately on the record, when continuing the trial, its reasons why a continuance outweighed the best interests of them and the public in a speedy trial pursuant to 18 U.S.C. § 3161(h)(7)(A). In its response to their motions, the government urged the district court to put its findings on the record prior to ruling on the motions. On January 24, 2012, the district court issued an order explaining that,

_____

[3]Four other remaining defendants, including Osei-Tutu and Sarnor-David, were also in attendance.

because of the unusual complexity of the case, "the ends of justice served by the granting of the continuances in this matter outweigh the best interest of the public and Defendants in a speedy trial." The district court then excluded the period from September 29, 2011, through February 7, 2012, from the Speedy Trial Act computations.

Later in the day on January 24, 2012, a magistrate judge held a hearing on the defendants' motions. Relying on the transcript from the September 29 status conference, the magistrate judge recommended denying the motions to dismiss, finding that the district court "implicitly" made the necessary findings during the hearing. On February 1, 2012, the district court adopted the recommendation and denied the motions.

"The [Speedy Trial] Act requires that the trial begin within 70 days after a defendant is charged or makes an initial appearance unless the running of the time is stopped for reasons set out in the statute." United States v. Lucas, 499 F.3d 769, 782 (8th Cir. 2007) (en banc). Among the statutorily approved reasons for days to be excluded from the speedy-trial calculation is an "ends-of-justice" continuance: A trial may be delayed if a district court finds the ends of justice so require and "sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Once those days are excluded, however, "if the total number of non-excludable days exceeds seventy, then the district court must dismiss the indictment upon the defendant's motion." United States v. Villarreal, 707 F.3d 942, 953 (8th Cir. 2013) (quotation omitted). It is the defendant's burden to show the motion should be granted. Id. "We review the district court's findings [for purposes of the Speedy Trial Act] for clear error and its legal conclusions de novo." Id. (quotation omitted).

On appeal, neither Okeayainneh nor Adeniran contends the district court relied on improper factors in granting the motion to continue. Instead, they argue the district court erred in granting the continuance because it did not issue its findings

until *after* they filed their motions to dismiss. "Although the Act is clear that the findings must be made, if only in the judge's mind, before granting the continuance . . . the Act is ambiguous on precisely when those findings must be 'se[t] forth, in the record of the case.'" Zedner v. United States, 547 U.S. 489, 506–07 (2006) (quoting 18 U.S.C. § 3161(h)(8)(A)). "[A]t the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." Id. at 507.

Okeayainneh and Adeniran concede we have previously held that the district court is not required to make a contemporaneous record of its ends-of-justice findings. See United States v. Clifford, 664 F.2d 1090, 1095 (8th Cir. 1981) ("While a court generally should make the findings required by section 3161(h)(8)(A)[4] at the time it grants the continuance, the Speedy Trial Act does not require the court to make a contemporaneous record."); see also United States v. Stackhouse, 183 F.3d 900, 901 (8th Cir. 1999) (per curiam) ("Contemporaneity is not required . . . and a subsequent articulation suffices."). In this case, the district court issued its findings approximately one week before ruling on the motions to dismiss. Okeayainneh and Adeniran point to nothing in the record to suggest that the reasons set forth in the district court's January 24 Order were not in fact the reasons it originally considered in excluding the time from September 29, 2011, to February 7, 2012. While we agree "[t]he best practice, of course, is for a district court to put its findings on the record at or near the time when it grants the continuance," Zedner, 547 U.S. at 507 n.7, under the circumstances of this case, the factors relied upon by the district court in making its ends-of-justice determination were proper. We affirm the district court's denial of the defendants' motions to dismiss the third superseding indictment.

---

[4]This is now codified at 18 U.S.C. § 3161(h)(7)(A).

## B. Julian Okeayainneh

## 1. Motion for Judgment of Acquittal

Okeayainneh appeals the district court's denial of his motion for judgment of acquittal on Count 1, conspiracy to commit bank fraud. We review de novo the denial of a motion for judgment of acquittal, and our standard of review is the same standard we apply to a sufficiency of the evidence challenge. United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010). On review, "we will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). "To convict a defendant of conspiracy, the government must prove that there was an agreement to achieve an illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became part of that agreement." United States v. Morris, 723 F.3d 934, 939 (8th Cir. 2013) (quotation omitted).

Okeayainneh asserts there was insufficient evidence to support his conviction for conspiracy to commit bank fraud because the government failed to show he knew about the conspiracy or voluntarily and intentionally joined it. The evidence against Okeayainneh included the testimony of Angela Grigsby, Bernard Thomas, and Jamie Bryntensen who all testified that Coker recruited them in May 2010 to fly to California to open fraudulent bank accounts, which they did under the direction of Okeayainneh. When the three arrived in California, Okeayainneh picked them up at the airport and gave them their counterfeit identification cards, as well as personal information about the identities they were to assume and additional documents they needed to open business accounts. Okeayainneh took them to a hotel and instructed them to memorize the information he had provided. Although Thomas was unable to open an account with his documentation, Grigsby and Bryntensen both opened accounts and withdrew money from them; they gave the money to Okeayainneh.

Because Thomas had not opened any accounts, Okeayainneh did not pay for his return trip to Minnesota; he did, however, pay for the return flights of Grigsby and Bryntensen. Grisby and Bryntensen flew to California a second time, where they again engaged in similar fraudulent conduct with Okeayainneh.

Grigsby continued to open fraudulent bank accounts in Minnesota under the direction of both Okeayainneh and Coker. One of the accounts she opened was a business bank account at Associated Bank using the stolen identity of J.B. Okeayainneh admitted sending a stolen check for $107,018.71 to Minnesota for deposit into this fraudulent account. After Thomas returned to Minnesota, he agreed to deposit a counterfeit check from Okeayainneh into his own bank account on two occasions. After the checks cleared, Thomas withdrew the entire sum in a series of cash withdrawals. He gave the money to Coker.

The evidence found inside Okeayainneh's storage locker—including passport photos of both Adeniran and Grigsby—also strongly supports the jury's finding that Okeayainneh knew about, and intentionally joined, the conspiracy to commit bank fraud and that he did not simply commit "isolated acts" of fraud. Numerous counterfeit identifications and stolen and counterfeit checks were located in the storage locker, linking him to the aspect of the bank fraud that involved opening fraudulent accounts. Also in the storage locker were approximately 500 credit cards in the names of other people and hundreds of stolen credit-card mailers (offers for new credit cards mailed directly to customers), as well as equipment for manufacturing counterfeit credit cards. This evidence linked Okeayainneh to the aspect of the bank fraud that involved using stolen credit cards. Okeayainneh's storage locker also contained handwritten notes with background information about the people whose identities and credit cards had been stolen. Okeayainneh admitted the notes found in the locker were in his handwriting, and he admitted agreeing with Coker and Grigsby to deposit stolen checks into fraudulent bank accounts and withdraw the proceeds. The evidence presented at trial was more than sufficient to support Okeayainneh's conviction for conspiracy to commit bank fraud.

-10-

## 2. Conspiracy Chart

Throughout Okeayainneh's trial, the government repeatedly referenced Exhibit 222: an organizational chart depicting the names and photographs of 20 people involved in the criminal activity at issue, including Okeayainneh and his co-defendants. The photographs were labeled with the roles each member purportedly played in the crime: "Foot Soldier," "Bank Insider," "Manager/Facilitator." Okeayainneh's photo was labeled "Leader/Organizer." At the top of the chart appeared the word "Conspiracy" in capital letters. Exhibit 222 was introduced through the government's first witness, Detective Louis Beauchane, one of the principal investigators in the case.

Detective Beauchane identified individual photographs of the people depicted in the chart and testified about their purported roles in the conspiracy, and the government moved to admit Exhibit 222. After it was admitted and published to the jury, Okeayainneh's trial counsel objected to the exhibit on the basis that it drew legal conclusions. The court ruled counsel's objection was late, and the exhibit remained in evidence.

Okeayainneh argues that the district court erred in admitting Exhibit 222 into evidence over his objection. The government responds that he did not preserve this issue for review because his objection at trial was untimely.

To preserve an evidentiary issue for appellate review, a timely objection must be made. Fed. R. Evid. 103(a)(1). "The rule is well settled in this circuit that for an objection to be timely it must be made at the earliest possible opportunity after the ground of objection becomes apparent, or it will be considered waived." Terrell v. Poland, 744 F.2d 637, 638–39 (8th Cir. 1984). In Terrell, we agreed that a motion to strike made after the close of all evidence was untimely. Id. at 639. Similarly, in McKnight ex. rel. Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1407–08 (8th Cir. 1994), we held that the Federal Rules of Evidence require objections to be

"contemporaneous" and ruled that an objection made at the close of a witness's testimony did not meet that requirement.

In the case at hand, however, defense counsel did not wait until the end of Detective Beauchane's testimony, nor until the close of all evidence. Instead, it appears from the record that counsel raised her objection mere moments after Exhibit 222 was introduced. There was still ample opportunity for the judge to prevent further potential damage. We conclude that Okeayainneh preserved this issue for appeal and that our review is for an abuse of discretion. United States v. Beal, 279 F.3d 567, 570 (8th Cir. 2002).

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. "The danger of permitting presentation of a summary of some of the evidence in a criminal case is plain. The jury might rely upon the alleged facts in the summary as if these facts had already been proved[.]" United States v. Scales, 594 F.2d 558, 564 (6th Cir. 1979). Such evidence is proper, however, when it "assist[s] the jury in understanding the testimony already introduced" and "fairly summarizes" trial evidence. United States v. Boesen, 541 F.3d 838, 848 (8th Cir. 2008). In addition, "summaries may include assumptions and conclusions so long as they are based upon evidence in the record," United States v. Spires, 628 F.3d 1049, 1053 (8th Cir. 2011) (quotation omitted), but may be rejected if they are too conclusory or inaccurate, see United States v. Crockett, 49 F.3d 1357, 1361 (8th Cir. 1995).

The chart at issue in this case was presented *before* any of the evidence the government claims it was meant to summarize and was referenced repeatedly throughout the remainder of the trial. The government concedes the chart was first introduced at the start of trial, and thereafter, "[w]hen a witness would refer to a defendant by name or nickname, Exhibit 222 would be displayed and the witness would be asked if the person's picture appeared on the exhibit." The government

argues that the chart was merely used "for the purpose of having witnesses put a face to a name." But this purpose could easily have been accomplished without the offending captions. In addition to being used as a tool in closing argument, the chart was presented to the jury as substantive evidence and taken into the jury room to be considered during deliberation. Cf. Crockett, 49 F.3d at 1362 (emphasizing concern with the prosecution's use of summary charts in closing argument and warning against visual aids in which "summary comes wrapped in improper argument"). We conclude that the district court's decision to admit Exhibit 222 as substantive evidence was an abuse of discretion because it was unfairly prejudicial and conclusory to present a photo of the defendant with a caption labeling him the leader of the conspiracy, when no witness had yet testified to that fact.

An erroneous evidentiary ruling is harmless, however, if it did not have a substantial influence on the jury's verdict. United States v. Samuels, 611 F.3d 914, 919 (8th Cir. 2010). The investigator who testified about the contents of Exhibit 222 had been involved in the investigation since it began in 2009, had knowledge of the people depicted, and could testify as to what his investigation showed their roles to be. The investigator was subject to cross examination about the chart, and Okeayainneh's counsel specifically elicited from the investigator the concession that the chart was created by the government and simply depicted "what the government thinks is going on." Okeayainneh's counsel made the same point in closing argument: "[j]ust because they have a chart with my client's head at the top doesn't mean he's the kingpin of this operation." In addition, we note that two of the defendants on the chart, identified as "bank insiders"—Sarnor-David and Osei-Tutu—were acquitted of all charges. Thus, the jury's verdicts reflected an individual assessment of each defendant and the evidence against him or her, not an unthinking acceptance of the government's views as depicted on the chart. Multiple witnesses testified as to Okeayainneh's guilt. The government also presented Okeayainneh's own admissions. When, as here, the government's evidence of a defendant's guilt is so overwhelming, any error related to the admission of a summary chart is harmless. Spires, 628 F.3d at 1053.

### 3. Admissions During Proffer

Okeayainneh next argues that the district court erred in granting the government's motion in limine to admit statements he made during a January 18, 2011 proffer session with the government. After he was arrested, Okeayainneh and his defense counsel met with federal agents and a federal prosecutor for a proffer session. Prior to the session, Okeayainneh reviewed a proffer letter, which included the requirement that he "respond truthfully and completely to any and all questions or inquiries that might be put to [him] at the meeting." The letter warned Okeayainneh that "any statements made or other information provided by [him] during the meeting" could be used against him for any purpose if the government concluded he "knowingly withheld material information from the government or otherwise [had] not been completely truthful and candid." Okeayainneh reviewed the proffer letter with his counsel, and the prosecutor also reviewed the terms of the agreement with Okeayainneh. Okeayainneh signed the letter, agreeing to its terms.

While preparing for trial, the government obtained audiotapes of telephone calls that Okeayainneh made while incarcerated, which they had translated and transcribed. The telephone calls—made on January 14 and 15, 2011, just days before Okeayainneh signed the proffer letter—revealed that Okeayainneh had decided to give false information to investigators, and withhold relevant information from them during the session.

In its motion in limine seeking permission to introduce Okeayainneh's proffer statements at trial, the government asserted that Okeayainneh had breached the express terms of the agreement by providing material false information during the proffer session. After reviewing the translated transcripts, the district court allowed the use of Okeayainneh's proffer statements, finding that he had "explicitly agreed to" the "clear and unambiguous" terms of the agreement, which entitled the government to use his statements "against him for <u>any purpose</u>," if it was found he was "not truthful and/or knowingly withheld material information." The decision of

the district court enforced the agreement under principles of contract law, consistent with our precedent. See United States v. Hyles, 521 F.3d 946, 952 (8th Cir. 2008).

On appeal, Okeayainneh does not directly contest that he breached the proffer agreement. Instead, he argues that he did not knowingly waive his Fifth Amendment right against self-incrimination when he entered into the agreement due to "a strained relationship with counsel" and an incomplete understanding of the proffer process. While Okeayainneh presented a variation of this argument in a filing with the district court, he offered no evidence to support it. Argument is not evidence, see United States v. Fetlow, 21 F.3d 243, 248 (8th Cir. 1994), and without any evidence to support this claim, the district court did not err in admitting the statements at trial. See also United States v. McFarlane, 309 F.3d 510, 514 (8th Cir. 2002) (explaining that by entering into an informal immunity agreement, "the defendant essentially gives up his right to later assert his Fifth Amendment privilege" as to the information he provided under the terms of the agreement).

## 4. Sentencing Issues

Okeayainneh challenges the district court's imposition of four sentencing enhancements. Specifically, he argues the evidence did not support a 24-level increase for loss in excess of $50 million, a 6-level increase because the offense involved at least 250 victims, a 4-level increase for his role in the offense, or a 2-level increase for obstruction of justice. "We review interpretation of the Sentencing Guidelines de novo and a district court's application of the Guidelines to the facts for clear error." United States v. Rutherford, 599 F.3d 817, 820 (8th Cir. 2010). "[S]entencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." United States v. Scott, 448 F.3d 1040, 1043–44 (8th Cir. 2006).

According to Okeayainneh's presentence report (PSR), the actual loss of the conspiracy was $7,155,763.53, and the intended loss was at least $54,870,388.62.

Included within the intended-loss estimate were the checks found in Okeayainneh's storage locker, which had a total face value of over $18 million. Okeayainneh concedes that intended loss, because it is the greater value, is the proper measure for Guidelines purposes. See USSG § 2B1.1 cmt. n.3(A). He asserts, however, that because many of the checks found in the storage locker were photocopies, they had no real value. Thus, he concludes, the district court's loss calculation impermissibly included "checks or account numbers that could not possibly be used to cause a loss" and is too high. He asserts the proper intended loss estimate was under $50 million.

Because it is often difficult to calculate the precise amount of loss in a fraud case, district courts "need only make a reasonable estimate of the loss," USSG § 2B1.1 cmt. n.3(C), and may base the estimate on only a preponderance of the evidence. United States v. Parish, 565 F.3d 528, 534 (8th Cir. 2009). We greatly defer to the sentencing judge's loss determination because he "'is in a unique position to assess the evidence and estimate the loss based upon that evidence.'" Id. (quoting USSG § 2B1.1 cmt. n.3(C)). Accordingly, we review the district court's loss calculation for clear error. Id.

As defined in the Guidelines, intended loss includes "pecuniary harm that was intended to result from the offense," even if that pecuniary harm "would have been impossible or unlikely to occur." USSG § 2B1.1 cmt. n.3(A)(ii). So even if some of the checks found in Okeayainneh's storage locker were expired or "could not possibly be used to cause a loss," the district court was permitted to include them in the total amount of intended loss. Cf. United States v. Jordan, 544 F.3d 656, 672 (6th Cir. 2008) (upholding intended-loss calculation including full $811,000 value of checks mailed to lock-box even though the lock-box account had been frozen before funds could be withdrawn); United States v. Ravelo, 370 F.3d 266, 273 (2d Cir. 2004) (upholding district court's intended-loss calculation that included attempted cash advances drawn in excess of cash-advance limit on stolen credit cards). Nor was it unreasonable for the court to use the full face value of the checks in its loss calculation: When a defendant obtains access to a credit line, whether by fraudulently

applying for credit cards, see United States v. Grant, 431 F.3d 760, 764 (11th Cir. 2005), or by writing counterfeit checks, see United States v. Santos, 527 F.3d 1003, 1008 (9th Cir. 2008), the district court may infer that the defendant would seek the full value of that line of credit. Because Okeayainneh presented no contrary evidence that he did not intend to use the full face value of the checks, the court permissibly calculated the loss using the full amount.

Okeayainneh does not contest the total dollar amount of the checks found in the storage locker and has not otherwise pointed to anything in the record to suggest that the district court's estimation of loss is unreasonable. We cannot conclude that the court's estimate is clearly erroneous.

Okeayainneh next argues that the evidence does not support a 6-level increase for the number of victims involved, which the district court concluded was well over 250. Okeayainneh acknowledges that the government found 8700 "purported" identities in the storage locker; but, he asserts, the government did not show that each of those identities belonged to separate, verifiable individuals and that none were duplicative. Okeayainneh concedes that at least 50 victims were verified but argues that the government did not prove that he used the means of identification of at least 250 individuals. Thus, he concludes, he should have received, at most, a 4-level increase in his Guidelines range.

Section 2B1.1(b)(2) of the Sentencing Guidelines provides for a 6-level increase if the offense involves at least 250 victims and a 4-level increase if the offense involves at least 50 victims. The application notes to USSG § 2B1.1 define two categories of a "victim" for fraud offenses involving identity theft: (1) "any person who sustained any part of the actual loss . . . [or] bodily injury as a result of the offense," whether or not their identifying information actually was used; and (2) "any individual whose means of identification was used unlawfully or without

authority," even if they suffered no loss or bodily injury.[5]  USSG § 2B1.1 cmt. n.1 & 4(E).  A person does not become a victim, however, merely because a defendant *possessed* her identifying information; it is only when that information is "actively employed to further the purpose of the conspiracy or scheme" that she becomes a victim.  United States v. Rabiu, 721 F.3d 467, 472–74 (7th Cir. 2013) (citing United States v. Hall, 704 F.3d 1317, 1322–23 (11th Cir. 2013)).

Thus, we agree with Okeayainneh that the conspiracy did not involve 8700 "victims" under USSG § 2B1.1.  But as the government points out, over 500 victims were in fact identified, and evidence at trial showed that those persons' identifying information had been used to create fraudulent driver's licenses, open fraudulent bank accounts, or withdraw funds from those accounts.  The number is even higher when the number of defrauded banks is added.  See USSG § 2B1.1 cmt. n.1 (defining "[p]erson," for purposes of a "victim," to include "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies").  The district court agreed that the evidence supported a finding that Okeayainneh's offense involved more than 500 victims, which is well over the 250 victims required for the 6-level enhancement.  Given the evidence presented, we cannot say the district court clearly erred in making this finding.

Okeayainneh next argues the evidence did not support a 4-level increase for role in the offense.  Section 3B1.1(a) of the Sentencing Guidelines provides "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."  In determining whether the enhancement applies, we consider

---

[5]Application Note 1 to USSG § 2B1.1 advises that "means of identification" has the meaning set forth in 18 U.S.C. § 1028(d)(7) and encompasses only actual persons, not fictitious persons.  The definition in § 1028(d)(7) includes any "name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

USSG § 3B1.1 cmt. n.4. Okeayainneh asserts his co-defendant Coker was the true leader of the conspiracy, whereas he oversaw only a "few participants who traveled to California to open accounts." At sentencing, the court "strongly reject[ed]" Okeayainneh's argument. The district court noted that multiple witnesses at trial testified that Okeayainneh provided them with counterfeit identities and checks, instructed them how to commit the fraud, and took them to particular target banks to engage in the fraudulent transactions. Okeayainneh collected the proceeds from the participants recruited to cash the checks, paying them only a percentage of the total amount obtained. It was Okeayainneh's storage locker, which he frequently accessed, that contained the numerous documents and materials used in the overall conspiracy. The district court did not clearly err in applying the 4-level enhancement for Okeayainneh's leadership role.

Okeayainneh last challenges a 2-level increase in his offense level imposed because the district court found he had intentionally lied to investigators during his proffer session. Section 3C1.1 of the Sentencing Guidelines provides for a 2-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Here, the district court imposed the enhancement after it concluded that Okeayainneh had "provid[ed] a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." USSG § 3C1.1, cmt. n.4(G). As we have previously held, "th[is] enhancement applies only

when the materially false statement '*significantly obstructed or impeded* the official investigation or prosecution of the instant offense.'" United States v. McKanry, 628 F.3d 1010, 1021 (8th Cir. 2011) (quoting USSG § 3C1.1 cmt. n.4(G)); see also United States v. Williams, 288 F.3d 1079, 1081 (8th Cir. 2002) (rejecting enhancement because government failed to provide any evidence of extent to which defendant's dishonesty impeded its investigation).

Okeayainneh asserts that the government failed to offer any evidence to support the finding that his false statements during the proffer session "significantly obstructed or impeded the official investigation or prosecution of the instant offense." We agree. The government chose not to offer any evidence on this issue at sentencing. Instead, the government argues on appeal that the district court was entitled to rely upon the representation of the Assistant United States Attorney that, "[w]e wasted time, resources on all of those things." It is the government's burden to prove by a preponderance of the evidence that the enhancement pursuant to § 3C1.1 applies. United States v. Bledsoe, 445 F.3d 1069, 1072 (8th Cir. 2006). The prosecutor's statement to the court was not evidence. See Fetlow, 21 F.3d at 248.

The government's argument that the enhancement should apply because Okeayainneh *attempted* to obstruct justice also fails. While an attempt may be sufficient for other types of obstructive conduct listed in application note 4 to USSG § 3C1.1, the conduct for which Okeayainneh received the enhancement requires that an investigation actually be impeded in some way. See McKanry, 628 F.3d at 1021. The cases the government cites involve different forms of obstruction and are inapposite to the issue before us. See United States v. Smith, 665 F.3d 951, 955–57 (8th Cir. 2011) (Application Note 4(A): attempt to retaliate against a witness); United States v. Jones, 612 F.3d 1040, 1046 (8th Cir. 2010) (Application Note 4(A) and (B): attempt to establish a false alibi and suborning perjury); United States v. Brown, 560 F.3d 754, 772 (8th Cir. 2009) (Application Note 4(D): attempt to destroy evidence). Without any evidence to support the finding that the false statements substantially

obstructed or impeded the official investigation or prosecution of the instant offense, it was clear error to impose the 2-level enhancement for obstruction of justice.

## C. Olugbenga Adeniran

## 1. Motion for Judgment of Acquittal

Adeniran argues the government failed to prove the existence of a single conspiracy to commit bank fraud. He asserts the nature of the activities involved in this case shows there were two conspiracies: the one in which he participated, involving the use of fraudulent credit cards to get cash advances and gift cards; and the other, involving the opening of fraudulent bank accounts for the purpose of depositing, and then cashing, stolen and fraudulent checks. He notes that his use of fraudulent credit cards occurred solely in Minnesota during a two-month period, while the conspiracy involving the fraudulent bank accounts was a multi-state endeavor that spanned from 2006 to March 2011. He asserts the variance between the government's indictment—which alleged a single conspiracy—and the evidence at trial—which, he asserts, proved two or more conspiracies—infringed on his substantial rights. Adeniran notes that he did not know many of the people involved in the overall conspiracy, including Okeayainneh, and few people knew him. "Whether a given case involves single or multiple conspiracies depends on whether there was one overall agreement to perform various functions to achieve the objective of the conspiracy." United States v. Radtke, 415 F.3d 826, 838 (8th Cir. 2005) (internal quotations and citation omitted). We look at the totality of the circumstances, and "because it is a question of fact, we draw all reasonable inferences in favor of the verdict." Id.

Adeniran's arguments are well-taken, but he overlooks several key points. First, "to be guilty of a single conspiracy, the conspirators need not know each other or be privy to the details of each enterprise comprising the conspiracy as long as the evidence is sufficient to show that each defendant possessed full knowledge of the

-21-

conspiracy's general purpose and scope." United States v. Chantharath, 705 F.3d 295, 301–02 (8th Cir. 2013) (quotation omitted). "That the conspirators entered the conspiracy at different times and played discrete roles does not compel a finding of multiple conspiracies." United States v. Santisteban, 501 F.3d 873, 881 (8th Cir. 2007). It is sufficient that there was an agreement to commit bank fraud, that Adeniran knew of the agreement, and that he intentionally joined in the agreement. Morris, 723 F.3d at 939–40 (quotation omitted). "A single conspiracy may exist even if the participants and their activities change over time and even if many participants were unaware of, or uninvolved in, some the transactions. Further, the agreement need not be explicit, but may be tacit, based upon the actions of the defendant." United States v. Ramon-Rodriguez, 492 F.3d 930, 941 (8th Cir. 2007). Adeniran may have known a relatively small number of fellow conspirators, but that fact alone does not support a finding of multiple conspiracies.

Second, the ultimate "objective of the conspiracy" in this case was to commit bank fraud by various means. As the government notes, the indictment alleged that the purpose of the conspiracy to commit bank fraud "was to obtain and use means of identification of other persons to create false bank *and credit card accounts*" and "to obtain money and merchandise through the use of fraudulently obtained bank account information, *credit cards*, and counterfeit checks." (Emphasis added.)

Finally, based on the evidence presented at trial, Adeniran had regular contact with others who were involved in both the credit card *and* the bank account aspects of the conspiracy—further supporting the conclusion that he understood the purpose and scope of the conspiracy. For example, evidence showed that Coker recruited people to help open fraudulent bank accounts; Adejumo, too, was involved in the fraudulent bank account aspect of the bank fraud. Adeniran was connected to both of these men. Coker was in the car with Adeniran on January 7, 2010, at Southdale Center shortly before Adeniran's arrest, and Coker continued to use the same counterfeit credit card Adeniran had used that led to his arrest. Telephone records also linked Adeniran to both Adejumo and Coker, active members of the bank-fraud

-22-

conspiracy, during the relevant time period.[6] Other witnesses also testified that Adeniran had knowledge of the bank-account aspect of the conspiracy. Cooperating co-defendant Borode Akinropo heard Adeniran discuss opening fraudulent bank accounts and depositing stolen checks for later withdrawal with both Coker and Adejumo. Cooperating co-defendant Jude Okafor overheard Adeniran, Coker, and Adejumo discussing how to open fraudulent bank accounts for the purpose of committing bank fraud.

Drawing all reasonable inferences in favor of the jury's verdict, the evidence supported a finding of a single conspiracy with one "general purpose and scope." In this case, the jury could reasonably find that Adeniran knew of the agreement to commit fraud and that he intentionally agreed with at least Coker and Adejumo to join the agreement, largely through the use of counterfeit and stolen credit cards and fraudulent identification documents. See Morris, 723 F.3d at 939.

## 2. Sentencing Issues

Adeniran asserts the district court erred when it determined his "offense otherwise involved sophisticated means." Section 2B1.1(b)(10) of the Sentencing Guidelines provides for a 2-level enhancement for using "sophisticated means" in a fraudulent scheme. United States v. Kieffer, 621 F.3d 825, 835 (8th Cir. 2010). "[S]ophisticated means" consists of "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1(b)(10) cmt. n.9(B). The enhancement applies "when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." United States v. Jenkins, 578 F.3d 745, 751 (8th Cir. 2009) (quotation

---

[6]Records showed 321 telephone calls between numbers associated with Adeniran and Adejumo from November 4, 2009, to January 7, 2010, and 178 telephone calls between numbers associated with Adeniran and Coker from November 19, 2009, to January 13, 2010.

omitted). The enhancement may be appropriate when a defendant's scheme "did not involve a single fraudulent act, but a complex series of fraudulent transactions." Kieffer, 621 F.3d at 835 (quotation omitted). The factual finding that a scheme qualifies as "sophisticated" is reviewed for clear error. United States v. Huston, 744 F.3d 589, 592 (8th Cir. 2014) (quotation omitted).

Contrary to Adeniran's assertions, his offense was not a simple, straightforward enterprise such as stealing a credit card out of a mailbox and using it to purchase gift cards or get cash advances. See United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007). Evidence at trial showed that he used multiple stolen credit cards diverted from their true owners by others in the conspiracy. When arrested, he was in possession of three stolen credit cards and corresponding identification documents, specifically created with his picture on them. In addition, he had handwritten notes with personal information about the people whose credit cards had been stolen, which he used when obtaining cash advances and gift cards. Adeniran's conduct was complex—including obtaining identification documents to match the stolen credit cards—and it was repetitive in nature. Adeniran also benefitted from his co-conspirator's activities in rerouting the credit cards and creating fake identification documents to assist him in his credit-card scheme. See United States v. Pizano, 421 F.3d 707, 734 (8th Cir. 2005). We cannot say the district court clearly erred when imposing this enhancement.

Adeniran next asserts the district court improperly applied a 3-level enhancement for being a manager or supervisor of a criminal activity involving five or more participants. See USSG § 3B1.1(b). Adeniran does not dispute that more than five people participated in the conspiracy; rather, he contests the role he played in the conspiracy. The government argues Adeniran's phone calls with Coker and Adejumo—both classified by the government as high-level members of the conspiracy—demonstrate that he was likewise a manager or supervisor. The government asserts Adeniran's calls from the jail to Adejumo and Coker indicate Adeniran was quite concerned that the handwritten notes seized from him at the time

-24-

of his arrest could compromise the ongoing bank-fraud conspiracy, and that a "mere foot soldier would not be expected to possess" such documents.[7]

"The government bears the burden of proving by a preponderance of the evidence that the aggravating role offense is warranted." United States v. Gaines, 639 F.3d 423, 427 (8th Cir. 2011). "The district court's factual findings, including its determination of a defendant's role in the offense, are reviewed for clear error, while its application of the guidelines to the facts is reviewed de novo." Id. at 427–28 (quotation omitted).

We broadly define what constitutes evidence sufficient to support an aggravating role enhancement. Despite the breadth of our definition, however, "[w]e have always required evidence that the defendant directed or procured the aid of underlings." United States v. Irlmeier, 750 F.3d 759, 764 (8th Cir. 2014) (quoting United States v. Rowley, 975 F.2d 1357, 1364 n.7 (8th Cir. 1992)). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of *one or more* other participants." Irlmeier, 750 F.3d at 763 (quoting USSG § 3B1.1 cmt. n.2).

In this case, the evidence is simply insufficient. The district court relied on the trial testimony of co-defendants Okwuchukwu Jidoefor, Kabaso Manda and Jude Okafor and the presence of Adeniran's photos in Okeayainneh's storage locker to support its finding that Adeniran played a managerial role in the conspiracy. Neither Jidoefor, Manda, nor Okafor testified that Adeniran recruited them, planned or organized their criminal activity, or exercised any decision-making authority over

_____

[7]Okeayainneh also supplied Grigsby, Thomas, and Bryntensen with the names, birth dates, social security numbers, and phone numbers of the people they impersonated when opening business bank accounts. A notebook containing similar information was found in Grigsby's purse when she was arrested. The government has never alleged Grigsby or Bryntensen was anything but what it terms a "foot soldier," and Thomas was not indicted.

their participation in the bank-fraud scheme.  Jidoefor, one of Coker's close associates, saw Adeniran only once.  Jidoefor did not speak to Adeniran and was not introduced to him.  Manda testified he was recruited into the conspiracy by his friend "Chris," who paid for his flight to Minnesota.  It was not until the day after his arrival that Manda met "the man from New York"—whom he identified as Adeniran—at Adejumo's house.  While Manda went with Adejumo to various banks to get cash using fraudulent documents, Adeniran "did his own thing."  Finally, although Okafor pleaded guilty to aiding and abetting Adeniran from November to December 2009 by allowing Adeniran and others to meet at his shop, he conceded on cross examination that Adeniran came to his shop only once and never discussed credit-card fraud with him.  The one time Adeniran was in the shop, Okafor testified, he offered to let Adeniran work in exchange for food because Adeniran had no money.  The mere presence of Adeniran's photo in the storage locker, where numerous and varied forms of identification also were located, does nothing to suggest a leadership role in the conspiracy.

Likewise, phone calls to managers in the conspiracy, without more, does not mean Adeniran is necessarily a manager as well; and concern for the success of the conspiracy is likely to be a sentiment shared by all conscientious participants.  The evidence in this case does not support a finding that Adeniran was an organizer, leader, manager, or supervisor of any other person in the conspiracy, and it was error to impose a 3-level enhancement pursuant to USSG § 3B1.1(b).

Finally, Adeniran argues the district court misapplied the Sentencing Guidelines definition of "relevant conduct" in determining his sentence for the conspiracy conviction.  Relevant conduct is determined under the Guidelines based on a defendant's own acts and, in the case of jointly undertaken activity,"all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  USSG § 1B1.3(a)(1)(B).  "Actions are reasonably foreseeable to a defendant when they fall within the scope of the agreement between the defendant and the co-conspirators."  United States v. Hodge, 594 F.3d 614, 620

(8th Cir. 2010) (quoting United States v. Casares–Cardenas, 14 F.3d 1283, 1288 (8th Cir. 1994)).

Adeniran argues he should be held accountable for only the loss amount and number of victims directly attributable to his use of fraudulent credit cards to obtain cash advances or buy gift cards in the Minneapolis metro area from November 2009 to January 2010. Based solely on the substantive counts on which he was convicted, according to Adeniran, the loss is $122,175 with a total of four victims. He contends the district court erred because the amount of loss and number of victims attributed to Okeayainneh—an intended loss of over $50 million and more than 250 victims—was not part of the jointly undertaken criminal activity in which he agreed to participate and was not reasonably foreseeable to him.

"We review the district court's findings as to scope of the defendant's undertaking, foreseeability to the defendant, and furtherance of the conspiracy for clear error." United States v. Spotted Elk, 548 F.3d 641, 677 (8th Cir. 2008). We review the district court's application of the Guidelines de novo. Id. "[A] defendant's conviction for conspiracy does not automatically mean that [he] has foreseen the [total amount of bank fraud] involved in the entire conspiracy." Id. at 674. In determining the individual defendant's relevant conduct, the district court must look at what the individual has agreed to do and whether the actions of others in the conspiracy were foreseeable from his vantage point. Id.

Ample evidence supports Adeniran's involvement in the charged conspiracy from November 2009 to his January 7, 2010, arrest. Lacking in the record, however, is any evidence of Adeniran's involvement in the conspiracy before or after these dates. "The commentary to § 1B1.3 expressly states that conduct of the other conspirators that occurred before the defendant joined the conspiracy is ordinarily not 'relevant conduct,' comment. (n.2), and we have reasoned from this exclusion that a person should also not be held responsible for the losses that occur after he exits the conspiracy." Id. (quotation omitted). The Guidelines require an individualized

assessment of Adeniran's criminal undertaking, and being convicted on the same charge as a co-defendant—here, Okeayainneh—does not necessarily equate to a calculation of the same offense level. Okeayainneh's offense level was calculated based on his participation in nearly all aspects of the conspiracy to commit bank fraud over a substantial period of time. As we have concluded, the record supports the district court's findings that a loss of at least $50 million and involvement of at least 250 victims were reasonably foreseeable to Okeayainneh.

In contrast, based on the evidence presented at trial, Adeniran was significantly less involved in the conspiracy in scope and time. On appeal, the government argues "[t]he district court concluded that the entire intended loss amount should be attributable to Adeniran as relevant conduct because 'Adeniran had a managerial role in the conspiracy.'" But as we concluded previously, the evidence does not support a finding that Adeniran was a manager for purposes of the enhancement. The district court improperly inferred from that enhancement the amount of loss and number of victims reasonably foreseeable to Adeniran. After removing that inference, there is insufficient evidence to support the district court's findings regarding Adeniran's plans in connection with the conspiracy and what was foreseeable to him. Because of this, we conclude the district court clearly erred in finding Adeniran was responsible for at least $50 million in loss and at least 250 victims. We leave to the district court on remand to make the individualized determination of what was reasonably foreseeable to Adeniran for purposes of these enhancements.

### D. Adetokunbo Adejumo

Adejumo pleaded guilty to one count of bank fraud and one count of aggravated identity theft based on the use of a stolen credit card, and the district court imposed a sentence of 124 months. Adejumo raises several issues related to his sentence. He asserts the district court erred by imposing a 2-level enhancement for obstruction of justice, denying a reduction for acceptance of responsibility, imposing

a 3-level enhancement for role in the offense, refusing to allow him to challenge the amount of loss, and calculating his criminal history score.

Adejumo first asserts the district court erred in assessing a 2-level enhancement pursuant to USSG § 3C1.1 for obstruction of justice. After pleading guilty in federal court in July 2011, Adejumo was released pending sentencing. In October 2011, Adejumo was arrested and charged with domestic assault in connection with an incident involving a former girlfriend, Salan Sarhan. Based on the arrest, his pretrial services supervisor filed a petition to revoke his pretrial release. At the hearing on the petition on October 20, 2011, Officer Elliot Faust testified that approximately twelve hours after the incident, Sarhan reported Adejumo had slapped, choked, and kicked her until she began to black out. The government also introduced photographs Officer Faust had taken of Sarhan when she reported the incident that showed marks on her neck. Sarhan also testified at the October 20 hearing. She remembered being choked and passing out, she remembered Adejumo and another man standing over her when she regained consciousness, but she did not recall who assaulted her because she was intoxicated at the time. Adejumo testified he did not assault Sarhan and was standing over her to protect her from the other people present. He testified he did not know who assaulted Sarhan.

The magistrate judge found there was probable cause to believe Adejumo violated state law and revoked Adejumo's pretrial release. In a written order, the magistrate judge stated that he "expressly" believed the version of events originally reported by Sarhan to Officer Faust the afternoon after the attack and "expressly" did not believe Adejumo. Based on this finding, Adejumo's PSR recommended a 2-level enhancement pursuant to USSG § 3C1.1 for providing "materially false information to a . . . magistrate judge." See USSG § 3C1.1 cmt. n.4(F). Material evidence is defined as "evidence . . . that, if believed, would tend to influence or affect the issue under determination." Id. § 3C1.1 cmt. n.6. Adejumo objected, denying he falsely testified at the revocation hearing. Adejumo argues the district court erred by relying

exclusively on the magistrate judge's factual findings rather than making its own independent findings when imposing the enhancement.

"We review a district court's factual findings in support of an obstruction of justice enhancement for clear error and its application of the sentencing guidelines to the facts *de novo*." United States v. O'Dell, 204 F.3d 829, 836 (8th Cir. 2000). "The government bears the burden of proving the facts necessary to support a finding of obstruction by a preponderance of the evidence." United States v. Thundershield, 474 F.3d 503, 507 (8th Cir. 2007).

The Sentencing Guidelines provide for a 2-level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1. "A defendant who commits perjury is subject to this enhancement, as is a defendant who provides materially false information to a judge or magistrate." O'Dell, 204 F.3d at 836 (quotation and internal citation omitted). "A defendant commits perjury if, under oath, [he or she] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. (quotation omitted).

Officer Faust was available to testify at Adejumo's sentencing hearing. When asked, Adejumo agreed the district court could rely on the transcript from the October 20 hearing to resolve the issue and declined the opportunity for a de novo hearing before the district court. To the extent Adejumo argues the district court's reliance on the transcript from the October 20 hearing was error, it was invited, and he is now estopped from raising that objection. United States v. Jewell, 614 F.3d 911, 919 (8th Cir. 2010). "The doctrine of invited error applies when the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action." Id. at 920 (quotation omitted).

Adejumo also suggests that by relying on the transcript of the revocation hearing, the district court may have found the enhancement applied based on a probable-cause standard rather than making the finding based on a preponderance of the evidence. Adejumo points to nothing in the record, however, to suggest the district court failed to apply the proper standard when imposing the enhancement. Relying on the transcript—as Adejumo agreed it could—the district court made its own independent findings and concluded Adejumo willfully had provided materially false information to the magistrate judge. Because "a district court's choice between two permissible views of the evidence cannot be considered clearly erroneous," Thundershield, 474 F.3d at 509, the district court did not err.

Adejumo next asserts the district court erred by not giving him a 3-level reduction in his offense level for acceptance of responsibility. According to Adejumo, his is an "extraordinary case" warranting a reduction for acceptance of responsibility even with the obstruction-of-justice enhancement because his testimony at the revocation hearing was unrelated to the underlying offense and because he had provided information and assistance to the government but received no sentencing benefit as a result.

We review the district court's denial of an acceptance of responsibility reduction for clear error and will reverse "only if it is so clearly erroneous as to be without foundation." United States v. William, 681 F.3d 936, 938 (8th Cir. 2012) (quotation omitted). "Ordinarily, a defendant who obstructs justice is not entitled to the reduction for acceptance of responsibility." United States v. Hutterer, 706 F.3d 921, 925 (8th Cir. 2013) (quotation omitted). It is only in "extraordinary cases" that a defendant who has been found to have obstructed justice is eligible for the acceptance of responsibility reduction. Id. This does not mean, however, that it is impossible to receive both adjustments.

In determining whether a case is "extraordinary," sentencing courts are to look at "the totality of the circumstances, including the nature of the [defendant's]

obstructive conduct and the degree of [defendant's] acceptance of responsibility." United States v. Honken, 184 F.3d 961, 968 (8th Cir. 1999). "[T]he district court must inquire into the particular circumstances of the defendant's case: was the defendant's obstructive conduct a relatively brief or early aberration, or was it a methodical, continued effort to obstruct justice?" Id. at 972. Although it is rare that a defendant who has obstructed justice will nonetheless earn a reduction for acceptance of responsibility, we noted in Honken that a defendant's "other positive actions" could make his case "extraordinary." Id. at 973. The types of conduct qualifying as obstructive are numerous and diverse, and the degree to which the obstructive conduct affects the investigation, prosecution, or sentencing of a defendant can vary widely. Additionally, a defendant may accept responsibility for the offense of conviction but act in an obstructive way that is substantively unrelated to his offense conduct.

The district court in this case concluded that "[b]y perjuring himself regarding a material issue before Magistrate Judge Noel, Adejumo did not exhibit behavior consistent with the acceptance of responsibility," and therefore his was "not an extraordinary case." The district court noted that Adejumo "did not voluntarily terminate his obstructive conduct – perjury; nor did he admit it." Thus, the district court concluded that "[t]he totality of the circumstances does not suggest that Adejumo has demonstrated acceptance of responsibility for his offense."

While the district court properly considered Adejumo's conduct at the revocation hearing and whether he voluntary admitted his obstructive conduct, we note several other factors relevant to the Honken analysis the court did not consider. Adejumo timely pleaded guilty and truthfully admitted the conduct comprising the offense of conviction. He attempted to cooperate with the government, meeting with them several times. In a written statement to the probation office dated October 12, 2011, he admitted his conduct as to the offenses of conviction and expressed he was "truly remorseful for the harm he has wrought on all involved, including the Government." He expressed the same remorse during his allocution at his sentencing

-32-

hearing. Additionally, the obstructive conduct was unrelated in substance to the offense conduct for which Adejumo pleaded guilty. These are all factors that weigh in favor of a case being considered "extraordinary."

Whether this is one of those extraordinary cases in which a defendant can earn a reduction for acceptance of responsibility even after receiving an enhancement for obstruction of justice is, in our view, a relatively close question. Yet we defer to district courts in these fact-intensive matters, including assessments of credibility and sincerity that the district court is best equipped to consider. With that deference in mind, we cannot say the district court's decision here was "so clearly erroneous as to be without foundation." See William, 681 F.3d at 936 (quotation omitted). The district court properly considered that Adejumo neither voluntarily terminated his obstructive conduct nor admitted it. In addition, Adejumo's false testimony occurred after his guilty plea, a factor we have found "would almost certainly be disqualifying." United States v. Brown, 539 F.3d 835, 841 (8th Cir. 2008) (quotation omitted). The district court did not clearly err in denying Adejumo an adjustment for acceptance of responsibility.

The district court assessed Adejumo a 3-level enhancement under USSG § 3B1.1(b) for being a manager or supervisor in a criminal activity involving five or more participants. On appeal, Adejumo does not dispute that his criminal activity involved five or more participants. He contends, however, the district court erred in relying on the evidence presented at the trial of Okeayainneh and Adeniran because he was not present and was not provided an opportunity to challenge the evidence. He further asserts that even if the district court properly relied on the trial testimony, this testimony was insufficient to establish he had control over anyone else or received a larger share of the proceeds.

At his sentencing hearing, the government stated its intent to have the court rely on the trial testimony of Adejumo's co-defendants. The district court gave Adejumo an opportunity to object, but Adejumo acquiesced. Accordingly, we find

-33-

Adejumo has waived any objection he had to the district court relying on testimony from the trial, precluding appellate review. See United States v. Thompson, 289 F.3d 524, 526 (8th Cir. 2002).

In determining the enhancement applied, the district court found, among other factors, that "Adejumo met with and gave direction to recruits and exercised management responsibility over assets of the conspiracy." Indeed, Manda testified that it was Adejumo who picked him up from the airport when he arrived from Atlanta and paid for his hotel during his stay. Manda brought with him multiple fraudulent documents, which he gave to Adejumo, and it was Adejumo who decided which ones to use each day. Adejumo drove Manda to banks where Manda obtained cash advances using fraudulent credit cards, and Manda turned all of the money over to Adejumo. Adejumo later gave Manda a percentage of the proceeds for his efforts. Adejumo also took Manda to malls to purchase gift cards with the fraudulent credit cards. Manda returned to Minnesota the next month to conduct another week's worth of similar fraudulent transactions with Adejumo. Another witness, Jacqueline Clack, testified Adejumo was "the mind behind what I was doing."

We conclude the district court did not clearly err in assessing Adejumo a 3-level enhancement for being a manager or supervisor. "A manager or supervisor need only have managed or supervised one other participant" in criminal activity, and "the enhancement may apply even if the management activity was limited to a single transaction." United States v. Zimmer, 299 F.3d 710, 724 (8th Cir. 2002) (quotations omitted). At a minimum, Adejumo exercised managerial or supervisory authority over Manda during November and December 2009—within the time period to which Adejumo stipulated he was involved in bank fraud. Accordingly, the district court did not err.

Although Adejumo stipulated in his plea agreement that he and others obtained or attempted to obtain in excess of $1 million, he did not concede he was personally responsible for the entire amount, and he did not plead guilty to a conspiracy. At his

plea hearing, the government told Adejumo and the court that, while it believed the amount of loss was more than $1 million but less than $2.5 million, Adejumo would be allowed to dispute the loss amount at sentencing. When Adejumo objected to the amount of loss recommended in the presentence report, the government did not contest his ability to do so. At sentencing, however, Adejumo agreed with the court that he was bound by the stipulation in his plea agreement. Because he so agreed, Adejumo is precluded from disputing the loss amount on appeal. See Thompson, 289 F.3d at 526–27.

Finally, Adejumo received two criminal history points for committing "the instant offense while under any criminal justice sentence" based on the finding that he was on probation for a 2003 conviction for financial-transaction card fraud at the time the instant offense occurred. See USSG § 4A1.1(d). "Instant offense" includes "any relevant conduct." Id. § 4A1.1 cmt. n.4. Neither party disputes that Adejumo's probation for the financial-transaction card fraud conviction ended on April 20, 2007. In determining Adejumo's criminal history, the district court found "[t]he instant offense began in 2006." Adejumo argues the instant offense did not begin until 2008, as stipulated in the plea agreement.

Adejumo concedes he did not raise this argument below, so our review is for plain error. United States v. Goodrich, 754 F.3d 569, 571 (8th Cir. 2014). "Under plain error review, it is the defendant's burden to prove (1) there was error, (2) that was plain, and (3) affected substantial rights." Id. "An error is plain when it is 'clear or obvious, rather than subject to reasonable dispute.'" United States v. Martin, 714 F.3d 1081, 1084 (8th Cir. 2013) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)). We ordinarily exercise our discretion to correct the error only if the error "affected the outcome of the district court proceedings." Id.

Adejumo argues it was plain error for the district court to find offense conduct occurred outside the parties' stipulation in the plea agreement, which referenced a 2008 start date, without taking evidence or making specific findings to support its

decision. Here, we cannot conclude any error on the part of the district court was "clear or obvious, rather than subject to reasonable dispute." Even in his objections to the PSR, Adejumo requested the district court find his three prior convictions, including the 2003 conviction, were relevant conduct to the instant offense. The district court declined to do so, finding that the instant offense began in 2006. In Adejumo's PSR, the relevant dates of his offense are identified as 2006 to 2011, and Adejumo did not object. Jacqueline Clack's testimony at trial also reasonably supported the district court's finding. We conclude the start date of Adejumo's instant offense was subject to reasonable dispute and, therefore, any possible error was not plain.

## III. Conclusion

Accordingly, the judgment is affirmed in part, and reversed and remanded in part for further proceedings consistent with this opinion.

_____